A. Kenneth **HAWKES**, Plaintiff-Appellant,

v.

**INTERNAL REVENUE SERVICE,** Defendant-Appellee.

No. 71–1633.

United States Court of Appeals, Sixth Circuit.

Sept. 25, 1972.

B. C. Clifton, Memphis, Tenn., for plaintiff-appellant; Saul C. Belz, Burch, Porter & Johnson, Memphis, Tenn., on brief.

Dane M. Scaccia, Love, Balducci & Scaccia, Syracuse, N. Y., on brief for amicus curiae.

Richard Halberstein, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee; Fred B. Ugast, Acting Asst. Atty. Gen., Meyer Rothwacks and Bennet N. Hollander, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief; Thomas F. Turley, Jr., U. S. Atty., J. N. Raines, Asst. U. S. Atty., Memphis, Tenn., of counsel.

Before CELEBREZZE, MILLER and KENT, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is an appeal from a District Court's refusal to order disclosure to Appellant of certain information possessed by the Internal Revenue Service. Appellant's request for such disclosure order was based upon the "Freedom of Information Act," 5 U.S.C. § 552.

Our consideration of this appeal necessarily leads us to construe portions of the Act and in so doing to consider the fundamental problems of public access to government information with which the Act dealt. The facts which give rise to the present dispute are not complicated.

Kenneth A. Hawkes was indicted for criminal tax fraud in June, 1970. As part of his effort to prepare a defense against the charges Hawkes sought to obtain information and documents held by the Internal Revenue Service. He sought some of the desired material through the regular discovery procedures provided by Rules 16 and 17(c) of the Rules of Criminal Procedure. Additionally, however, he also sought materials and information directly from the Revenue Service.

In July, 1970 a letter was sent to the Assistant Commissioner of Internal Revenue formally requesting: (1) copies of Forms 899 and 4340 recording past assessments and payments relevant to Hawkes' federal tax obligations; (2) copies of IRS documents pertaining to the "closing" of an audit of Hawkes' 1965 tax returns; (3) specified portions [1] of the Internal Revenue Manual relating to the examination of returns, interrogation of taxpayers by agents of the Service and other matters which Hawkes felt would be useful in preparing a defense. While the first two sets of material had also been requested in the motion for discovery,[2] the Manual was requested for the first time in the letter to the Assistant Commissioner.

The Assistant Commissioner replied to Hawkes' requests in a letter dated July 17, 1970. The Internal Revenue Service

---

1. An index to titles of the Manual had previously been supplied to Hawkes enabling him to specify the sections of the Manual he wished to inspect and copy.

2. When the District Court passed upon the Discovery motion it granted access to such 899 and 4340 Forms as were available, but indicated that the papers sought with respect to the 1965 audit no longer existed.

official ordered that relevant 4340 Forms be made available to Hawkes; he declined to release the requested portions of the Internal Revenue Service Manual or the material pertaining to the closing of the 1965 audit, however. Hawkes appealed to the Commissioner of Internal Revenue seeking disclosure of all the materials originally requested. The Commissioner rejected the appeal and affirmed the decision of his subordinate on September 24, 1970.

Thereafter, on October 27, 1970, while the criminal charges were still pending, Hawkes returned to the District Court and commenced this separate civil suit, seeking an order requiring the Internal Revenue Service to disclose all materials requested in Hawkes' letter to the Assistant Commissioner. He predicated his complaint upon the provisions of 5 U.S.C. § 552. The case was assigned to the District Judge who was presiding over Hawkes' criminal case.

The Internal Revenue Service moved to dismiss the civil suit on the grounds that: (1) Hawkes' failure to seek the I.R.S. Manual through criminal discovery processes barred resort to the equity powers of the Court under the Freedom of Information Act and (2) Even if the Court were free to exercise its powers with respect to the documents the Manual was excluded from the general disclosure requirements of the Freedom of Information Act by 5 U.S.C. § 552(b)(2).

 The District Court apparently accepted one or both of these arguments.

The substantive portion of its brief Memorandum Decision is reproduced in its entirety below:

This action is before the Court on the Government's motion to dismiss. In the action, plaintiff seeks, in aid of his defense against a pending criminal income tax fraud indictment, a copy of the handbooks and manuals outlining procedures for I.R.S. agents to follow in investigating the financial affairs of taxpayers. The basis of the motion to dismiss is that plaintiff can get all to which he is entitled through discovery in the criminal case and also that this material is exempt under the terms of the Freedom of Information Act, upon which Act plaintiff relies. Both parties have filed ample memoranda and, therefore, we do not believe that oral argument is necessary.

We conclude that the Government's motion to dismiss is well taken and that the action should be dismissed.

Upon entry of this decision Hawkes filed a notice of appeal.[3]

Even a cursory comparison of the facts set forth thus far in this opinion with the Memorandum Decision of the District Court reveals a significant problem. Appellant's complaint in this case sought disclosure of three distinct sets of materials: Certain I.R.S. forms relating to the assessment and payment of taxes by Appellant; information respecting a survey and audit of his 1965 tax returns; and portions of the I.R.S. Manual. The District Court's decision

---

3. Subsequent to the District Court's decision and to the filing of a notice of appeal in this matter Hawkes entered a plea of nolo contendere to the criminal tax fraud charges then pending against him. On February 18, 1972 the District Court found Hawkes guilty as charged and sentenced him to prison.

Although it is clear that the present suit was commenced as an adjunct to Hawkes' defense efforts in the criminal case we do not believe the change in status of that case renders this appeal moot. Access to material under the Freedom of Information Act is not limited to those with a particular reason for seeking disclosure. Instead the ma-

terial is available "to any person." 5 U.S.C. § 552(a)(3). Thus though the practical utility of the information to Hawkes may have diminished significantly in light of his conviction, he still retains the same right to seek the desired information as that possessed by any other person under the terms of the statute. See Davis, "The Information Act: A Preliminary Analysis," 34 University of Chicago L.Rev. 761, 765 (1967); cf. Davis, Administrative Law Treatise, 1970 Supplement at 120–121. (The Davis article, the leading critical commentary upon the Act, will be cited hereinafter in its Treatise form.)

mentions only the Manual, however. The I.R.S. arguments [4] accepted in the decision were directed only toward preventing the disclosure of the Manual; they did not deal with the other items. Thus neither explicitly nor implicitly through the adoption of the I.R.S. arguments did the District Court deal with the propriety of releasing the other documents sought in the complaint; nevertheless it dismissed the complaint in its entirety. This obvious failure to consider certain elements of the complaint requires a remand to enable the District Court to consider the propriety of a disclosure order respecting the documents other than the Manual.[5]

The parties' attention on appeal, as below, has of course been focused upon the question of whether or not disclosure of the designated portions of the Internal Revenue Service Manual is required by the Freedom of Information Act. It is to a consideration of that question that we now turn.

■ The Freedom of Information Act, under which disclosure of the Manual is sought and under which this suit was commenced, became effective in 1967. Though there has been considerable dispute as to the meaning of specific portions of the Act, there can be no question as to the overall intent of the Congress in passing the Act. Chief Judge Bazelon of the United States Court of Appeals for the District of Columbia put matters succinctly when he said: "The legislative history establishes that the primary purpose of the Freedom of Information Act was to increase the citizen's access to government records." Bristol-Myers Co. v. Federal Trade Commission, 138 U.S.App.D.C. 22, 424 F.2d 935, 938 (1970) cert. den. 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). The Act, as codified (5 U.S.C. § 552) is divided into three major subsections. Subsection (a) describes those documents which must be made available to the public. Subsection (b) specifically exempts certain materials from compulsory disclosure under the Act, while subsection (c) announces that the Act:

> "* * * does not authorize withholding of information or limit the availability of records to the public, except as specifically stated [in the Act]."

Force is given to the disclosure requirements by subsection (a)(3) which provides:

> Each agency, on request for identifiable records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person. On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, has jurisdiction to enjoin the agency from withholding agency records and to order the pro-

---

4. "Memorandum of Law in support of motion to dismiss."

5. The scope of such undertaking on remand may prove narrow indeed. There was a strong indication in the related criminal discovery proceedings that the I.R.S. forms and the material relating to the 1965 return audit could not be found or, in fact did not exist. The assumption of unavailability may, in fact, explain the District Court's failure to treat these items in the dismissal order. If, upon remand, the District Court determines, as a matter of fact that these materials cannot be located, the controversy as to their disclosure may be rendered moot.

We note also that upon appeal, the I.R.S., alerted to the fact that documents other than the Manual were still being sought, has made an argument that a specific exclusionary provision of the Information Act, 5 U.S.C. § 552(b)(7), bars disclosure of the material relating to the 1965 audit. The District Court has not passed on this argument, and while it clearly has some merit, we do not believe it wise for this Court to make a final evaluation of this argument until we have had the District Court's evaluation of the matter and its detailed description of the particular material sought (assuming such material can be located).

duction of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo and the burden is on the agency to sustain its action. In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

The Internal Revenue Service recognized that under the statute it had the burden of proof before the District Court and was obligated to show why disclosure should not be ordered if it wished to protect its records against public revelation.

It offered the District Court two arguments designed to avoid issuance of a disclosure order and repeats them now before us in seeking to justify the District Court's dismissal of Appellant's action.

The first argument proceeds on the assumption that a District Court dealing with a Freedom of Information case and possessing the power to issue injunctive orders under the Act is bound by those rules which traditionally governed a chancellor sitting in equity. Among the traditional restrictions on the exercise of equity power is the rule that equitable relief not be granted where an adequate remedy at law exists. *See* Vuin v. Burton, 327 F.2d 967, 970 (6th Cir. 1964). The Internal Revenue Service contends that at the time this suit was commenced Appellant had just such remedy at law available to him had he chosen to seek the Manual through the ordinary discovery process. For this reason, Appellee urges, the District Court was correct in dismissing the complaint and this Court properly should affirm that decision.

■ We cannot agree that affirmance is appropriate at this time. There are strong reasons to question the underlying validity of the argument advanced by the I.R.S. here and apparently accepted by the District Court below.[6] Of

---

6. Since it is likely that a change of circumstances during the pendency of appeal—i. e. termination of criminal proceedings for one reason or another—will frequently preclude review of the validity of the Internal Revenue Service's argument we believe it appropriate to comment on certain weaknesses in that argument.

It is premised on the theory that a court applying the Information Act sits as a Court of Equity, with the powers and restrictions which accompany such status. It is settled, however, that in granting courts injunctive power to use in behalf of federal policy the Congress may cut back on both the discretionary power and restrictions customarily associated with the exercise of equity jurisdiction. See Soucie v. David, 145 U.S. App.D.C. 144, 448 F.2d 1067 at 1076 n. 35 (1971), and cases cited therein. There is strong reason to believe that Congress intended to limit the equitable attributes of the power granted the courts under the Information Act and to deny the District Courts power to refuse disclosure of materials covered by the Act for any reason other than one contained in the exclusionary section of the legislation (5 U.S.C. § 552(b)).

See Tennessean Newspapers, Inc. v. Federal Housing Administration, 6th Cir., 464 F.2d 657, No. 71–1676 (decided May 4, 1972); David v. Soucie, *supra*; Getman v. N. L. R. B., 450 F.2d 670 (D.C.Cir. 1971), stay denied, 404 U.S. 1204, 92 S.Ct. 7, 30 L.Ed.2d 8 (1971).

Apart from any general limit on the use of equitable considerations to bar otherwise appropriate disclosure under the Act there is good reason to believe that the Congress intended to foreclose objections to disclosure based on the particular equity rule the Appellee relies upon here.

In contrast to previous legislation (see for example § 3 of the Administrative Procedure Act of 1946, 60 Stat. 238) the Information Act specifically and intentionally makes all information discloseable under its terms, available "to any person." See 5 U.S.C. § 552(a) (3). Such exemptions as are allowed in the Act are based on the nature of the material sought—not the identity or status of the seeker. To accept the Internal Revenue Service's argument here would be to focus on the identity of the particular seeker, allowing Appellant's attorney, for instance, to obtain the material sought in his own name,

more immediate significance, however, is the fact that the condition precedent to the applicability of the argument even on its own terms—availability to Appellant of an alternative legal remedy—no longer exists. As noted elsewhere in this opinion,[7] Appellant Hawkes entered a plea of nolo contendere in the criminal tax fraud cause shortly after the District Court dismissed his complaint in the present civil matter. In February, 1972 the District Court adjudged Hawkes to be guilty of the charges against him and sentenced him to prison. It seems clear that now, months after that sentence was pronounced, the discovery process, designed to help a defendant prepare for trial, is unavailable to appellant. *See* Farnell v. Solicitor-General of United States, 429 F.2d 1318 (5th Cir. 1970); United States v. Kessler, 253 F.2d 290 (2d Cir. 1958).

■■ Thus Appellant is now without any means other than those provided by the Information Act of obtaining the material he seeks. Yet his suit under the Information Act has been dismissed in part because of the very availability of other relief. This Court is obligated to take notice of changes in fact or law occurring during the pendency of a case on appeal which would make a lower court's decision, though perhaps correct at the time of its entry, operate to deny litigants substantial justice. McLeod v. General Electric Co., 385 U.S. 533, 87 S. Ct. 637, 17 L.Ed.2d 588 (1967); Watts, Watts & Co. v. Unione Austriaca Di Navigazione, 248 U.S. 9, 39 S.Ct. 1, 63 L.Ed. 100 (1918); Michigan Surety Company

v. Service Machinery Corp., Inc., 277 F.2d 531 (5th Cir. 1960); Brownell v. Kaufman, 102 U.S.App.D.C. 133, 251 F.2d 374 (1957). We believe such a denial of justice would result if the District Court's order were to be affirmed upon the theory that alternative avenues of relief are available to Appellant.

Were this theory the sole basis for the District Court's decision we could conclude our work and simply order a remand for reconsideration of Appellant's original complaint. As the Internal Revenue Service points out, however, the District Court's decision rests on a second ground as well: A holding that the portions of the Manual sought by Appellant are not subject to compulsory disclosure under the terms of the Information Act itself. If this holding is correct, the need for a remand on the question of the Manual's disclosure may be obviated.

The Act provides:

(a)(2) Each agency, in accordance with published rules, shall make available for public inspection and copying

(C) administrative staff manuals and instructions to staff that affect a member of the public.

It further provides:

(b) This section does not apply to matters that are—

(2) related solely to the internal personnel rules and practices of an agency.

The I.R.S. contends that the Manual is not subject to disclosure initially under (a)(2)(C) and/or is in any event ex-

---

while denying it to his client. This approach is one the Act's draftsmen sought to avoid.

While certain conflicts between the civil disclosure suit under the Act and the criminal discovery process could arise where the two proceedings go forward simultaneously we believe such conflicts would be minimal in nature. Congress has provided protection for documents it wants disclosed only through the discovery process in exemptions (b)(7) and (b)(3) of the Information Act. We believe other problems caused by the overlap of the two means

of securing government material could be handled by the judicial process.

For these reasons we are led to conclude that Congress did not intend to require exhaustion of the criminal discovery process as a prerequisite to disclosure. Nevertheless given the complexities of the problem we refrain from making this conclusion a rule of law, binding on the District Courts of this Circuit, until such time as we have had an opportunity to examine the problem in the context of a live controversy.

7. See n. 3, *supra*.

empted from disclosure by Section (b)(2). We turn first to the question of whether (a)(2)(C) requires disclosure of information requested by Appellant. Obviously the material sought is contained in a staff manual. The materials do affect a member of the public in that they provide basic guidelines for investigation of various members of that public. The question remains, however, are the requested sections of the I.R.S. Manual administrative in nature?

The word administrative was not included in the original text of the bill introduced in the Senate. It was added to achieve a purpose and that purpose is set forth in the report of the Senate Committee on the Judiciary,[8] which report accompanied the bill on its passage through the upper House:

> The limitation of the staff manuals and instructions affecting the public which must be made available to the public to those which pertain to administrative matters rather than to law enforcement matters protects the confidential nature of instructions to personnel prosecuting violations of law in court, while permitting a public examination of the basis of administrative action. Sen.Rep. at 2.

Just precisely where the line between administrative and law enforcement information is to be drawn is a difficult question. The comments on subsection (a)(2)(C) contained in the House Report are not helpful, for they do not address themselves specifically to the distinction established by the statute. Instead they seek to establish a broader category of material excluded from disclosure:

> [A]n agency may not be required to make available those portions of its staff manual and instructions which set forth criteria or guidelines for the staff in auditing or inspecting procedures, or in the selection or handling

of cases, such as operational tactics allowable tolerances, or criteria for defense, prosecution or settlement of cases. H.R.Rep.No.1497, 89th Cong. (2d Sess.) pp. 7–8 [hereinafter cited as H.R.Rep.].

Professor Kenneth C. Davis commenting on this aspect of the House Report has stated:

> Since the statute required availability of administrative staff manuals and instructions that affect any member of the public, the House Committee's statement that portions of administrative staff manuals and instructions that affect any member of the public need not be available seems to contradict the Statute, Davis, Administrative Law Treatise, supra n. 3 at 137.

 We agree with Professor Davis that the House Report's comment on subsection (a)(2)(C) suggests an interpretation of the legislation which violates the language of the Act itself and conflicts with the Senate interpretation. Both because the statutory language should be given primacy and because the Senate Report was before both Houses when the Act was adopted (the Senate having acted first on the legislation) we believe that the administrative/law enforcement distinction provides the only legitimate basis for determining initially what manuals must be made available to the public. See Benson v. General Services Administration, 289 F.Supp. 590, 595 (W.D.Wash.1968), affirmed on other grounds, 415 F.2d 878 (9th Cir. 1969); Consumers Union of United States, Inc. v. Veterans Administration, 301 F.Supp. 796, 801 (S.D.N.Y.1969).

Acceptance of such an approach requires us to consider the nature of the distinction and its applicability to the types of documents involved in this case.[9]

---

8. Sen.Rep.No.813, 89th Cong. 1st Sess. (1965); hereinafter cited "Sen.Rep."

9. The discussion which follows, while touching upon the Internal Revenue

Manual, will necessarily be generalized since neither this Court nor, apparently the District Court, has examined the Manual over which the present legal battle is being waged.

In many agencies, among them the Internal Revenue Service, much activity which at its inception is administrative in character may eventually lead to law enforcement proceedings. It was obviously not the purpose of the Information Act to exclude from compulsory disclosure all material which might eventually affect the law enforcement process. Rather, it would seem logical to assume that the intent of the limit on (a)(2)(C) was to bar disclosure of information which, if known to the public, would *significantly impede* the enforcement process.

Law enforcement is the process by which a society secures compliance with its duly adopted rules. Enforcement is adversely affected *only* when information is made available which allows persons simultaneously to violate the law and to avoid detection. Information which merely enables an individual to conform his actions to an agency's understanding of the law applied by that agency does not impede law enforcement and is not excluded from compulsory disclosure under (a)(2)(C).

Far from impeding the goals of law enforcement, in fact, the disclosure of information clarifying an agency's substantive or procedural law serves the very goals of enforcement by encouraging knowledgeable and voluntary compliance with the law. Such clarifying information is found in agency rulings made public; it is also found in many cases in manuals and instructions like those sought here which are addressed specifically to agency personnel. It may be found in the criteria for investigative action; in standards for evaluation and so forth. Materials providing such information are administrative in character and clearly discloseable under (a)(2)(C).[10]

The exception for law enforcement materials contained in (a)(2)(C) is, as suggested above, a very narrow one and is to be applied only where the sole effect of disclosure would be to enable law violators to escape detection. Thus, for example, there is reason to exempt from compulsory revelation details of a selective enforcement policy made necessary by a lack of sufficient investigatory personnel. Similarly interrogation techniques or the mechanics of an F.B.I. "stakeout" arrangement properly could be excluded from disclosure under (a)(2)(C). See City of Concord v. Ambrose, 333 F.Supp. 958 (N.D.Cal., 1971).

Again, it must be emphasized that the exception to (a)(2)(C) disclosure is a narrow one, over-extension of which is as likely to thwart the overall goals of law enforcement as would its total disregard. Given these facts and the clear policy of the Information Act, doubts as

10. Professor Davis, in his detailed analysis of the Act, has suggested a similar approach although he does not spell out in specific terms the reasoning process by which he reaches his conclusions.

I firmly believe that staff manuals or instructions in the nature of substantive procedural law *should* be available. For instance, "guidelines for the staff in auditing" of tax returns ought to be open to the taxpayer to the extent that they tell the auditor the position of the Internal Revenue Service on any question of tax law. Furthermore, contrary to what the House committee says, I think a portion of "guidelines for the staff . . . in the selection of handling of cases . . . or criteria for defense, prosecution, or settlement of cases" should be open to inspection by any party affected by them. I agree that secrecy is desirable to the extent that policies about prosecuting depend upon such strategies as inducing maximum compliance with the least expenditure.

The opinion I have just expressed about what is desirable seems to me closer to what the statute says · than the statements of the two committees, which differ from each other and differ from the statute. When the materials emerging from the legislative process are so confused, an interpreter must be guided in part by what he believes to be a sound system. One fundamental principle is that secret law is an abomination. Davis, Administrative Law Treatise, *supra* n. 3 at 137.

to the meaning of this subsection should be resolved in favor of disclosure.

■■■ Neither this Court nor the District Court has examined the Manual portions sought. It is therefore impossible for us to state authoritatively which portions are subject to compulsory disclosure, although it would appear that several sections at least of the Manual would provide guidance as to the Service's understanding of substantive law and relevant procedures and would therefore be subject to disclosure under (a)(2)(C). *In camera* inspection of the Manual would provide a basis for application of the guidelines for disclosure suggested in this opinion and a remand for such inspection and evaluation seems reasonable. See Ackerly v. Ley, 137 U. S.App.D.C. 133, 420 F.2d 1336 (1969); Bristol-Myers Company v. Federal Trade Commission, 138 U.S.App.D.C. 22, 424 F.2d 935, 938 (1970).

The Internal Revenue Service offers an argument which would make a remand for such determination unnecessary if it were to be accepted, however. It contends that quite apart from the provisions of (a)(2)(C), compulsory disclosure of the Manual sought here is barred by one of the specific exemption clauses of the Information Act.[11]

Subsection b(2) of the codified version of the Act provides:

(b) This section does not apply to matters that are—

(2) related solely to the internal personnel rules and practices of an agency.

The Senate understood this exemption to be relatively narrow in scope.

Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave and the like. Sen.Rep. at 8.

The House, considering the Information Act after Senate passage, interpreted the exemption to include very different material, although it did not see fit to alter the Senate's language to reflect its disagreement with the upper house.

Matters relating solely to the internal personnel rules and practices of any agency: Operating rules, guidelines and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all "matters of internal management" such as employee relations and working conditions and routine administrative procedures which are exempt under present law. H.R.Rep. 10.

The disagreement between the houses is total. Resolution of the conflict between the two views of the statute is vital to this case since acceptance of the House version would bar disclosure of the materials requested, while adoption of the Senate understanding of the provision would make such materials available to the extent they qualified as "administrative" manuals.

The meaning of subsection (b)(2) has been considered in detail by two District Courts. Both concluded that the Senate's view of the exemption provision should be adopted. Benson v. General Services Administration, 289 F.Supp. 590, 595 (W.D.Wash.1968) affirmed on other grounds, 415 F.2d 878 (9th Cir. 1969); Consumers Union of United States v. Veterans Administration, 301 F.Supp. 796, 801 (S.D.N.Y.1969).[12] A similar conclusion was reached by Professor Davis who has engaged in the most intensive and extensive analysis of the Information Act's provisions. *See* Davis, Administrative Law Treatise *supra* at 144–45. We believe that these conclusions are sound.

■■■ Of greatest significance to us in reaching this decision is the fact that

11. The Internal Revenue Service has *not* suggested that any other specific exemption contained in section (b) of the Act applies to the particular portions of the Manual sought in this case.

12. But see, Cuneo v. Laird, 338 F.Supp. 504 (D.D.C.1972), appeal docketed, No. 71–1328, where a somewhat differing interpretation may have been adopted implicitly.

the plain import of the (b)(2) language clearly favors the Senate's interpretation. The statute's emphasis on personnel rules and practices suggests concern with conditions of employment and the like—not the matters of policy upon which the House focuses. *See* Benson v. General Services Administration, *supra*, 289 F.Supp. at 595. Further, interpreting the statute in the manner in which the House Report suggests would create conflicts with subsection (a)(2)(C) and (a)(1)(C). Consumers Union v. Veterans Administration, *supra*, 301 F.Supp. at 801. Such conflicts should be avoided where alternative interpretations are available.

■ Finally, we note that the Senate interpretation was before the House when it voted to approve subsection (b)(2) in exactly the same form as had passed the Senate earlier. To adopt the statutory interpretation put forward in the House Report would be to allow a single house of the Congress to effectively alter the meaning placed on proposed legislation by the other house without altering a word of the text. We do not believe that this represents a wise approach to statutory interpretation. *See* Benson v. General Services Administration; Consumers Union v. Veterans Administration, *supra*.

■ For all of these reasons we believe that the internal practices and policies referred to in (b)(2) relate only to the employee-employer type concerns upon which the Senate Report focused. With such view of the subsection in mind it is apparent that the type of material one would expect to find in the Manual sought by Appellant is unlikely to be exempted from disclosure by (b)(2).

We conclude therefore that a remand is necessary in order that the District Court may reconsider Appellant's request for disclosure of the Manual and other items in light of the construction placed upon the Information Act in this opinion. Where necessary *in camera* examination of the requested materials should be made by the District Court.

WILLIAM E. MILLER, Circuit Judge (concurring in part and dissenting in part).

Insofar as the majority opinion intimates a tentative view that the Freedom of Information Act places restrictions upon the discretionary jurisdiction and powers of a court sitting in equity, I find it necessary to dissent. In my concurring opinion in Tennessean Newspapers, Inc. v. Federal Housing Administration, 464 F.2d 657 (6th Cir. 1972). I found it unnecessary to decide whether a court may not in some situations under the Freedom of Information Act apply general equitable principles. It was my view then that "a strong argument can be made that courts do possess equitable powers under the Act." I remain of that opinion. Yet as in the *Tennessean Newspapers* case, I do not believe that any discussion of this issue—even the intimation of a tentative view—is required to dispose of the present appeal. With this qualification, I concur in the majority opinion.